1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

SOUTHERN DISTRICT OF CALIFORNIA

12

13

Todd Preston Okrusch,

14
Plaintiff,

15
v.

16
Michael J. Astrue, Commissioner of the
Social Security Administration,

17

18
Defendant.

19

| | |
|---|---|
| ) | Case No. 10cv2198 AJB (PCL) |
| ) | |
| ) | REPORT AND RECOMMENDATION: |
| ) | |
| ) | GRANTING IN PART PLAINTIFF'S |
| ) | MOTION FOR SUMMARY JUDGMENT |
| ) | [DOC. 16] |
| ) | |
| ) | and |
| ) | |
| ) | DENYING IN PART DEFENDANT'S |
| ) | MOTION FOR SUMMARY JUDGMENT |
| ) | [DOC. 17]. |

20

21

22

23

24

25

26

27

28

        Plaintiff Todd Preston Okrusch has filed a complaint seeking judicial review of

Defendant Social Security commissioner Michael J. Astrue's denial of his application for

Supplemental Security Income disability benefits under Titles II and XVI of the Social Security

Act. (Doc. 1.) Plaintiff has filed a Motion for Summary Judgment (doc. 16), and Defendant has

filed a Cross-Motion for Summary Judgment (doc. 17) and a Response in Opposition to Plaintiff's

motion (doc. 18). For the reasons set forth below, the Court recommends that Plaintiff's motion

be GRANTED IN PART, that Defendant's motion be DENIED IN PART, and that the case be

REMANDED for further administrative action.

///

**I. PROCEDURAL HISTORY**

Plaintiff claims he is disabled because of a lumber-yard back injury he received on January 25, 2007 and because of his type II diabetes. (A.R. 31.)

On February 14, 2008, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date beginning on January 25, 2007. (A.R. 11.) Plaintiff also applied for Supplemental Security Income benefits under Title XVI on February 14, 2008, alleging the same onset date of disability. (A.R. 11.) Both claims were denied at first on May 23, 2008 and upon reconsideration on August 15, 2008. (A.R. 11.) Administrative Law Judge (ALJ) Peter J. Valentino presided over a hearing of the case on February 9, 2010, in San Diego, California. (A.R. 11.) Also present and testifying were a Certified Rehabilitation Counselor and an impartial vocational expert, Mark Remas, M.A. (A.R. 11.) Plaintiff was represented by George S. Atcheson. (A.R. 11.)

In a decision dated February 26, 2010, the ALJ denied Plaintiff's request. (A.R. 11-20.) After considering all evidence in the record as a whole, the ALJ found:

1) Plaintiff met the insured status requirements of the Social Security Act through September 30, 2007. (A.R. 13.)

2) Plaintiff did not engage in substantial gainful activity since the alleged disability onset date of January 25, 2007. (A.R. 13.)

3) Plaintiff had two severe impairments: type II diabetes mellitus and lumbar strain. (A.R. 13.)

4) Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. No physician has opined that the claimant's condition meets or equals any listing, and the state agency medical consultants have opined that it does not. (A.R. 14.)

5) Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, except he would be limited to no climbing of ladders, ropes or scaffolds and occasional climbing of ramps or stairs. Additionally he could occasionally balance, bend, kneel, stoop, crouch, or crawl; and he should avoid workplace hazards such as unprotected heights and dangerous

10cv2198 AJB

machinery. (A.R. 14.)

      6) Plaintiff is unable to perform any past relevant work. (A.R. 18.)

      7) Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (A.R. 19.)

      8) Plaintiff had not been under a disability, as defined in the Social Security Act, from January 25, 2007 through the date of the ALJ's decision. (A.R. 19.)

      Plaintiff filed an appeal of the ALJ's decision on April 13, 2010. (A.R. 6.) The Appeals Council notified Plaintiff of its unfavorable ruling on August 24, 2010. (A.R. 5.) On October 16, 2008, Plaintiff filed the instant case pursuant to 42 U.S.C. § 405(g).

## II. ADMINISTRATIVE RECORD

      Plaintiff, a 43-year-old male, stands six feet tall and weighs approximately 160 pounds. (A.R. 24.)

      On January 13, 2007, Plaintiff was lifting pieces of lumber from a semi-tractor trailer as part of his lumber puller duties for Frost Hardwood Lumber when he felt a pop in his low back. He had increased pain and difficulty walking the next day. (A.R. 413.) He also was diagnosed with diabetes about six months before the January 2007 incident. (A.R. 395.)

      A. Medical Evidence

      1. Treating Physicians

      Plaintiff was seen by Dr. George Colson at Sharp Rees-Stealy Medical Center on January 25, 2007. (A.R. 384.) He was diagnosed with a low back strain. (A.R. 384.) He was provided with medications and was released to modified duties. (A.R. 413.) He was restricted from prolonged sitting and weight lifting more than ten pounds and was told not to kneel or squat or climb, bend, or twist repetitively. (A.R. 382.) One month later, the Sharp Rees-Stealy physician again released the patient to his usual and customary duties on a modified basis (A.R. 382), but Plaintiff could not return to his previous employer (A.R. 413). Plaintiff returned to Sharp Rees-Stealy on March 29, 2007 and was then referred for approximately six weeks of physical therapy. (A.R. 378, 413.) He still could not continue with his work duties. (A.R. 414.)

1         On March 29, 2007, Plaintiff was seen at Kaiser Permanente for back pain. (A.R. 276.)

2    The doctor found that he walked bent to the right. (A.R. 276.) The doctor diagnosed him with back

3    pain and muscle spasms and prescribed him ibuprofen, Flexeril, and Tylenol #3. (A.R. 276.) He

4    instructed Plaintiff to take two days off work and rest and then return to work with a restriction of

5    no heavy lifting for one month. (A.R. 276.)

6         On March 31, 2008, Plaintiff was treated by William Marks, M.D., who stated that

7    Plaintiff's primary diagnosis was type II diabetes and that he would be able to return to his regular

8    and customary work by August 15, 2008. (A.R. 294.)

9         On October 30, 2008, Plaintiff had an MRI of his back. (A.R. 415. This revealed a

10    superior end plate depression at the T-11 vertebra consistent with a compression fracture. (A.R.

11    415.) The patient was precluded from prolonged repetitive bending or stooping activities with his

12    low back. (A.R. 415.)

13         Dr. Sam Maywood took over his care on December 10, 2008. (A.R. 418.) After

14    examining the patient and looking at the results of the MRI, Dr. Maywood diagnosed Plaintiff

15    with lumbar spine strain, sprain with T11 compression fracture, and facet joint arthropathy at L4-

16    L5 and L5-S1. (A.R. 416-17.) Dr. Maywood refilled his prescriptions for Percocet, Ibuprofen,

17    Robaxin and authorized Plaintiff to have two thoracic epidural steroid injections. (A.R. 418.) He

18    was placed on temporary total disability for 45 days as his medical situation was evaluated. (A.R.

19    418.)

20         On February 5, 2009, Plaintiff was again seen by Dr. Maywood. (A.R. 420.) Dr.

21    Maywood disagreed with Dr. Christopher Pallia's evaluation of Plaintiff's condition and his

22    recommendation that he receive lumbar facet joint injections. (A.R. 420.) Instead, Dr. Maywood

23    stated that Plaintiff's main pain generator was a compression fracture and not facet joint syn-

24    drome. (A.R. 421.) Dr. Maywood stated that Plaintiff had severe pain in the lower thoracic, mid

25    upper thoracic region and that his range of motion is limited to 60 degrees of flexion and 30

26    degrees in extension, 30 degrees in right and left lateral bending and 20 degrees in right and left

27    lateral rotation. (A.R. 421.) He diagnosed him with thoracic radiculopathy secondary to a

28    compression fracture and refilled his previous prescriptions. (A.R. 421.)

1    Dr. Maywood prepared a supplemental report on August 25, 2009. (A.R. 426.) In the

2    report, Dr. Maywood stated that Plaintiff's mechanism of injury is not from repetitive lifting of

3    heavy lumber but rather an incident where a heavy piece of lumber fell on top of forks of a

4    forklift, pushing into the patient's head and chest area, causing a pop in the back. (A.R. 426.) Dr.

5    Maywood also mentioned that Plaintiff experienced a low back injury back in 1994. (A.R. 427.)

6    Dr. Maywood apportioned 25 percent of Plaintiff's back disability to the 1994 injury and 75

7    percent to the 2007 injury. (A.R. 427.) Dr. Maywood updated his diagnoses to the following: 1)

8    lumbar spine strain/sprain with T11 compression fracture; 2) lumbar spine MRI evidence of facet

9    joint arthropathy at L4-L5 and L5-S1; and 3) lumbar spine history of straining injury on June 23,

10   1994 with permanent restrictions of either heavy lifting or very heavy lifting per the agreed

11   medical evaluator. (A.R. 427.) Dr. Maywood noted that his evaluation of Plaintiff's injury was

12   different from Dr. Pallia, the qualified medical evaluator, who thought that the thoracic spine was

13   the main pain producing area. (A.R. 428.)

14   In his January 11, 2010 supplemental report, Dr. Maywood stated that Plaintiff had

15   been diagnosed with type II diabetes that is not well controlled with recurrent hyperglycemia.

16   (A.R. 434.) After evaluating Plaintiff, Dr. Maywood disagreed with Plaintiff's previous medical

17   evaluation and opined that Plaintiff can lift, carry, push, or pull 10 pounds occasionally and 5-7

18   pounds frequently, walk or stand for up to 15 minutes per hour, and sit for up to 30-45 minutes

19   before needing to change positions. (A.R. 435.) Dr. Maywood stated that although Plaintiff would

20   not be able to stoop at all, he would be able to climb, kneel, and crouch occasionally. (A.R. 435.)

21   Dr. Maywood also stated that Plaintiff has vision problems and has difficulty with fingering,

22   gripping and grasping with the right hand. (A.R. 436.) Because of his physical limitations and all

23   the medications that Plaintiff is taking, Dr. Maywood opined that Plaintiff would not be able to

24   perform a full eight-hour workday as he "has difficulty with his activities of daily living that even

25   interfere with his ability to prepare and transport himself to and from work." (A.R. 435-36.)

26   2. Evaluating and Consulting Physicians

27   On July 31, 2008, Plaintiff received a consultative internist examination by Phong T.

28   Dao, D.O., at the direction of Department of Social Services. (A.R. 316.) His chief complaints

were back pain and type II diabetes, with which he was diagnosed two years ago. (A.R. 317.) He

stated that he had been hospitalized once for hyperglycemia over a year ago. (A.R. 317.) He

denied any syncope episodes due to hypoglycemia. (A.R. 317.) Plaintiff stated that he occasionally

gets soreness in his feet which is worse after he ambulates, but he denied having any vision

problems. (A.R. 318.) Plaintiff stated that he had low back pains for about two years also; he said

he twisted his back while working in a lumber yard and doing heavy lifting. (A.R. 317.) Plaintiff

described the pain as constant, increasing with bending, and alternating between an aching

sensation and a sharp pain. (A..R. 318.) Plaintiff reported smoking ½ to a pack of cigarettes a day

and drinks about six beers a week. (A.R. 319.)  On physical examination, Plaintiff showed no

acute distress, ataxia or dyspnea. (A.R. 319.) His back revealed some tenderness to palpation in

the midline paraspinal areas of L2 through L4; however straight leg raising was negative at 90

degrees, both sitting and supine with extension of 3 degrees and forward flexion of 85 degrees.

(A.R. 320.) His extremities showed no cyanosis, clubbing, edema, evidence of varicosities or

stasis dermatitis, and pedal pulses were 2+ bilaterally. (A.R. 320.) Upper and lower extremities

were all grossly normal; and the motor, sensory, reflex, cerebellar and cranial nerve tests were also

grossly normal. (A.R. 320.) His gait was within normal limits and he was able to stand on his heels

and toes and perform a tandem gait. (A.R. 321.) X-rays were taken which showed only mild

osteopenia and no other significant findings. (A.R. 321.) Dr. Dao diagnosed Plaintiff with diabetes

mellitus type II, not well controlled; low back pain due to lumbar strain; and tobacco abuse, which

in light of his diabetes would increase his risk of having a heart attack or stroke. (A.R. 321.) The

doctor opined that Plaintiff would be able to lift, carry, push or pull twenty pounds occasionally

and ten pounds frequently and he could sit or stand and/or walk up to six hours in an eight-hour

workday. (A.R. 322.) He could frequently climb, stoop, kneel, and crouch and there would be no

manipulative, visual, communicative or environmental limitations. (A.R. 322.)

     In August 2008, Plaintiff received a panel qualified medical evaluation by Dr. Chris

Pallia, M.D. for Workers' Compensation purposes. (A.R. 393.) During the physical examination it

was reported that Plaintiff's lumbar spine revealed no significant asymmetry of the back. (A.R.

396.) There was diffuse tenderness at the lumbosacral junction and the bilateral paraspinal

musculature. (A.R. 396.) He had slight pain in his low back with straight leg-raising in a seated position at 80 degrees on the left and right. (A.R. 396.) Range of motion testing revealed flexion of 2 feet from the ground with pain at the limits; and extension and left and right lateral bending of 30 degrees without pain. (A.R. 396.) He could walk on his heels and toes; sensation was intact; and deep tendon reflexes showed patellar of 2+ equal bilaterally and Achilles of 1+ equal bilaterally. (A.R. 396.) Lumbar spine x-rays showed that the disc spaces were well maintained and the nueroforamina appeared open on the facet joints. (A.R. 397.) The L4-5 facet joint on both views did not appear clear; otherwise, there was no evidence of any spondylolisthesis. (A.R. 397.) There was quite a bit of angulation occurring at the L5-S1 joint, but it was measured between the two films and there was an angle change of 9 degrees between the two levels, which is not consistent with any pathologic angulation of the L5-S1 level. (A.R. 397.) Dr. Pallia diagnosed Plaintiff with musculoligamentous lumbosacral strain, industrially-related, and possible L4-5 facet disease. (A.R. 397.) The doctor did note of interest that Plaintiff had previously been receiving treatment for his diabetes mellitus through County Medical Services but he did not seek treatment for his back even though it would seem reasonable that if Plaintiff had any significant ongoing discomfort in his back, which impaired him from becoming a member of the workforce, support-ing himself and taking care of his children, he would have sought out care for his back at that time through County Medical Services. (A.R. 397.)

When Plaintiff returned to Dr. Pallia on November 21, 2008, the doctor reviewed the MRI scan that was recommended for Plaintiff's lumbar spine at the previous evaluation. (A.R. 402.) The MRI revealed a T11 compression fracture; however, Plaintiff was not complaining of any pain up at this level in his back or on examination. (A.R. 402.) While the age of the fracture was not known, because Plaintiff was asymptomatic at this level, it was obviously healed in his opinion. (A.R. 403.) The other finding on the MRI was facet arthrosis at the L4-5 level, where Plaintiff was having some discomfort. (A.R. 403.) There was arthritic change of the facet joints, which was chronic and he may have suffered an aggravation of the facet arthrosis from his mechanism of injury, which could cause waxing and waning of pain in the lumbar spine. (A.R. 403.) The issue with the facet joints was that they are really aggravated with repetitive bending

and stooping activities, but not with appropriate lifting activities. (A.R. 403.) Dr. Pallia opined that Plaintiff had reached permanent and stationary status. (A.R. 403.) He has minimal to slight low back pain with regular activities, which can be aggravated to slight to moderate pain with bending or very heavy lifting in an bend-over position. (A.R. 403.) The only work restriction recommended by Dr. Pallia was to avoid prolonged repetitive bending or stooping activities with his low back. (A.R. 404.)

On May 27, 2009, Dr. Pallia issued a response to Dr. Maywood, Plaintiff's treating physician, and his differing evaluation of Plaintiff's condition. (A.R. 387.) Dr. Pallia noted that Dr. Maywood made the following impressions:

1. The T11 compression fracture is consistent with the mechanism of injury that this patient has described to me. He was lifting lumber weighing hundreds of pounds without assistance. I disagree with the opinions of Dr. Pallia.

2. He has thoracic radiculopathy secondary to compression fracture. On the physical examination though there was no dyseathesias noted.

3. There has been no medical evidence supporting the opinions of initial primary treating physician and the panel qualified medical evaluator, Dr. Pallia, when he states the compression fracture must have been preexisting. I believe that Dr. Pallia's opinion in regards to the compression fracture is unsupported by any medical evidence. I continue to recommend thoracic epidural steroid injections for this patient's complaints.

(A.R. 387-88.)

Dr. Pallia pointed out that Plaintiff described a level and location of pain deriving from the lumbar spine region and not the thoracic spine. (A.R. 390.) Dr. Pallia stated that Plaintiff's mechanism of injury was not from repetitive lifting of heavy lumber but a piece of lumber falling off one of the tongs of the forklift and pushing into his hands and chest region, causing him to feel a pop in his back. (A.R. 390.) Dr. Pallia stated that the mechanism of injury as described by the patient cannot cause a compression fracture and differs from the mechanism of injury that Dr. Maywood described in his report. (A.R. 390.) Dr. Pallia pointed to medical records he reviewed showing that Plaintiff had sustained a prior injury to his cervical, thoracic and abdominal regions

on March 9, 1994, when he was taken out of work for less than a month's time and returned back to full duties without restrictions on April 15, 1994. (A.R. 390.) He also pointed to records showing Plaintiff sustaining a second injury on June 23, 1994, after which he underwent treatment by a chiropractor, took time off work, and had normal x-rays and MRI of the lumbosacral spine on December 16, 1994. (A.R. 391.)   On December 22, 1994, he was diagnosed with spraining injuries, multiple lumbar paraspinous muscles with associated right sciatic neuritis. (A.R. 391.) He was given a permanent work restriction precluding him from heavy lifting activities by Jerome Auerbach, D.C., with no need for further formal active care. (A.R. 391.) On August 6, 2008, Plaintiff was asked whether he had any prior injuries to his low back; however, he denied that he did to Dr. Pallia at the time of his doctor visit. (A.R. 391.) The medical records showed that Plaintiff had two prior Workers' Compensation claims over his lower back from over 15 years ago, but Dr. Pallia opined that Plaintiff probably completely rehabilitated from his prior injury and had no prior pain. (A.R. 391.) Dr. Pallia stated that 25% of Plaintiff's current permanent impairment can be attributable to the natural progression of underlying arthritic changes in facet joints, non-industrial exposure to lifting activities such as carrying his young daughters and to his prior permanent restriction of no very heavy lifting and 75% of Plaintiff's current permanent impairment can be attributable to his new injury and work exposure while working for Frost Hardwood Lumber on January 25, 2007. (A.R. 391.)

### 3. Plaintiff's Reports

Plaintiff reported that he had an open workers' compensation claim for injury to his back, at the thoracic and lower levels. (A.R. 198.) He reported that he tried three different times to return to work after the incident but that he had not been able to last a full day at work due to pain and limitations of motion. (A.R. 198.) He stated that because he did not complete high school or receive other special training his work has always been physical. (A.R. 198.) He claimed that he got poor treatment from Dr. Colson soon after his injury. (A.R. 198.) He stated that he went to Dr. Pallia for examination and then to Dr. Maywood for treatment. (A.R. 198.) He stated that he got his diabetes medication from a clinic in the Spring Valley area. (A.R. 198.) He claims to have out-of-control diabetes. (A.R. 198.) He described having electricity feelings in his hands and feet and

1   on his right leg which he claims results from a combination of his injury and his diabetes. (A.R.

2   198.) He claims that he cannot handle or grasp for more than a couple of minutes before his hands

3   go numb and tingle. (A.R. 198.)

4                    B. Administrative Hearing

5                    On February 9, 2010, ALJ Peter J. Valentino conducted a hearing to determine

6   Plaintiff's disability benefits claims.  (A.R. 25.)  The Plaintiff appeared in person, represented by

7   his attorney.  (A.R. 25.)  Vocational Expert Mr. Reeves also testified.  (A.R. 25.)

8                         1. Plaintiff's Testimony

9                    Plaintiff testified that he was injured on January 25, 2007 while working in a lumber

10  yard as a forklift operator. (A.R. 29.) Plaintiff stated that he also has diabetes, which was

11  diagnosed a year prior to the 2007 injury. (A.R. 31.) He stated that he took two different kinds of

12  insulin six to ten times a day. (A.R. 31.) He also stated that he has seven screws and a couple of

13  plates in his hand, an injury that occurred in August of 2009 as a result of defending himself in a

14  fight. (A.R. 32.)  He stated that he started working again three months after the accident but his

15  work just involved taking orders from customers and no heavy lifting. (A.R. 38.) He eventually

16  stopped working for the lumber yard. (A.R. 39.)  Plaintiff stated that he lost his house, wife and

17  three daughters soon after the accident, and he split his time living in a motor home with his

18  girlfriend and living on a retired man's property. (A.R. 38-39.) In exchange for free board and use

19  of the retired man's car, Plaintiff watched over his acre and a half property and occasionally ran

20  errands for him. (A.R. 39-40.) He also usually drove his girlfriend to and from work using the

21  retired man's car. (A.R. 39.) During the day, Plaintiff usually slept when his girlfriend was

22  working. (A.R. 39.) He also tried to walk about an hour to an hour and a half everyday. (A.R. 39.)

23                   Plaintiff testified that he had not seen a chiropractor since his January 2007 injury.

24  (A.R. 40-41.) He acknowledged that he received chiropractic care for an injury he received in

25  1994. (A.R. 41.) He stated that he first received physical therapy at Sharp Rees-Stealy Medical

26  Center, was then treated by Dr. Pallia through Workers' Compensation, and for the last year and a

27  half was treated by Dr. Sam Maywood. (A.R. 41.) He stated that he tested his blood sugar levels

28  which are very high, many times a day, and managed his insulin levels with medication. (A.R. 42.)

He claimed that the medication causes stomach pain and nausea and makes it hard for him to concentrate. (A.R. 42.) He stated that the strongest medications he takes are Oxycodone and Methocarbamol, a muscle relaxant, and the medications cause him to sleep during the day while his girlfriend is at work. (A.R. 44.) He testified that he rarely stays awake for eight hours in a row. (A.R. 45.) He stated that the longest that he can stand and walk at one time is about 25 minutes at most. (A.R. 45.) He stated that he could be on his feet for a total of two and a half hours a day, but that he couldn't sit comfortably for long. (A.R. 46.) He stated that he is in the reclined position 15 to 16 hours a day. (A.R. 46.) He claimed that even carrying a bottle of milk from the store hurts his back. (A.R. 43.) He stated that the pain in his back "is always there" and the pain occasionally radiates down into his legs. (A.R. 43.)

In the years before the accident in the lumber yard, Plaintiff stated that he held three different jobs. (A.R. 30.) He stated that he worked as a landscaper, worked in a machine shop for five years, and worked at a Mobil gas station as a cashier. (A.R. 30.) He stated that he previously worked as an automated cashier for about six months and worked five to eight hours a day at this job. (A.R. 42.) Plaintiff stated that he currently didn't have employment other than helping a retired man watch over his property, occasionally drive him to the airport, and do other errands for him once in a while in exchange for using his car, parking his motor home on the property, and for free board. (A.R. 39-40.)

### 2. Vocational Expert's Testimony

Vocational expert Mr. Reeves testified that the lumber yard worker is heavy, semi-skilled work, that the lift truck operator is medium semi-skilled work, that the pizza delivery driver is unskilled, light work. (A.R. 51.) Mr. Reeves was asked if Plaintiff had the RFC provided by Dr. Maywood – that he can lift and/or carry, push or pull up to ten pounds occasionally and five to seven pounds frequently, walk or stand for up to 15 minutes per hour, and sit for up to 30 to 45 minutes; and able to climb, kneel or crouch occasionally, occasionally grip with his left hand and not able to stoop at all – Mr. Reeves stated that Plaintiff would not be able to do any past relevant work. (A.R. 51.) When asked if Plaintiff would be able to perform other type of work that he previously identified, Mr. Reeves replied in the affirmative. (A.R. 52.) When asked whether

Plaintiff could perform any of the enumerated jobs if Dr. Maywood's assessment that Plaintiff could not perform a full eight-hour workday were true, Mr. Reeves replied that he would not be able to perform any of the enumerated jobs. (A.R. 52.)

## III. ALJ DECISION

The ALJ sought to determine whether Plaintiff was disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (A.R. 11.) After finding that Plaintiff met the insured status requirements of sections 216(i) and 223, the ALJ ruled that Plaintiff was not disabled as defined by the Act from January 25, 2007 through the date of his decision. (A.R. 20, 12.)

The ALJ found that the evidence supported Plaintiff's claims of type II diabetes mellitus and lumbar strain, which are "severe" impairments as defined in the Social Security context. (A.R. 13.) However, these impairments, even when considered together, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 14.)

Plaintiff was left with sufficient residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except he would be limited to no climbing of ladders, ropes or scaffolds and occasional climbing of ramps or stairs. (A.R. 14.) Additionally, the ALJ found that Plaintiff could occasionally balance, bend kneel, stoop, crouch or crawl; and that he should avoid workplace hazards such as unprotected heights and dangerous machinery. (A.R. 14.) The ALJ based its RFC finding on the following evidence:

> Plaintiff was seen in follow-up at the Sharp-Rees-Stealy Medical Center on February 20, 2007 for a work status report. At that time Plaintiff was directed to return to modified work effective with the day of the examination. His only restriction was no prolonged sitting, weight lifting restriction to twenty-five pounds, and that he should change positions frequently. His diagnosis was reported as back strain.

> Plaintiff was seen at Kaiser Permanente on March 29, 2007, with complaints of back pain. He reported that he worked for a lumber company and that he hurt his back four weeks earlier with heavy lifting. Plaintiff said he was seen by a Workers' Compensation doctor who cleared him to return to work three days earlier; however, he says he has had recurrent severe right paralumbar pain and was unable to do any heavy lifting. The doctor did note that the claimant was walking bent to the right. After examining Plaintiff, the doctor diagnosed him with back sprain and muscle spasms and prescribed him ibuprofen, Flexeril and Tylenol #3. He was instructed to take two days off work and rest and then return to limited duty with a restriction of no heavy lifting for one

month.

Plaintiff's treating physician, William Marks, M.D., reported on March 31, 2008 that Plaintiff's primary diagnosis preventing him from performing his customary work was diabetes type II. The estimated date that Plaintiff would be able to perform his customary work was August 15, 2008.

On July 31, 2008, Plaintiff underwent a consultative internist examination by board eligible internist, Phong T. Dao, D.O. Plaintiff reported his chief complaints as back pain and type II diabetes mellitus. He stated that he was first diagnosed with diabetes about two years earlier. He denied any syncope episodes due to hypoglycemia and that his blood sugars were normally on the high side. Plaintiff reported that on occasion he did get soreness in his feet that was worse after he ambulated, but he denied any vision problems. Plaintiff stated that he has also had low back pains for about two years also; he said he injured his back while working in a lumber yard when he twisted his back while lifting a heavy load. The pain was described as constant pain that was worse with bending and alternated between an aching sensation and a sharp pain. He said the pain was worse when he tried to bend down to pick up objects or with prolonged standing or walking and it was improved with lying down in bed. It was reported that Plaintiff smoked ½ to a pack of cigarettes per day and drinks about six beers a week. On physical examination Plaintiff was in no acute distress and there was no apparent ataxia or dyspnea noted. His back revealed some tenderness to palpation in the midline paraspinal areas of L2 through L4; however straight leg raising was negative at 90 degrees, both sitting and supine with extension of 3 degrees and forward flexion of 85 degrees. His extremities showed no cyanosis, clubbing, edema, evidence of varicosities or stasis dermatitis, and pedal pulses were 2+ bilaterally. Upper and lower extremities were all grossly normal; and the motor, sensory, reflex, cerebellar and cranial nerve tests were also grossly normal. His gait was within normal limits and he was able to stand on his heels and toes and perform a tandem gait. X-rays were taken which showed only mild osteopenia and no other significant findings.

Dr. Dao diagnosed Plaintiff with diabetes mellitus type II, not well controlled; low back pain due to lumbar strain; and tobacco abuse, which in light of his diabetes would increase his risk of having a heart attack or stroke. The doctor opined that Plaintiff would be able to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently and he could sit or stand and/or walk up to six hours in an eight-hour workday. He could frequently climb, stoop, kneel, and crouch and there would be no manipulative, visual, communicative or environmental limitations.

Plaintiff was examined by orthopedic surgeon, Chris S. Pallia, M.D., for Workers' Compensation on August 5, 2008. During the physical examination it was reported that Plaintiff's lumbar spine revealed no significant asymmetry of the back. There was diffuse tenderness at the lumbosacral junction and the bilateral paraspinal musculature. He had slight pain in his low back with straight leg-raising in a seated position at 80 degrees on the left and right. Range of motion testing revealed flexion of 2 feet from the ground with pain at the limits; and extension and left and right lateral bending of 30 degrees without pain. He could walk on his heels and toes; sensation was intact; and deep tendon reflexes showed patellar of 2+ equal bilaterally and Achilles of 1+ equal bilaterally. Lumbar spine x-rays showed that the disc spaces were well maintained and the nueroforamina appeared open on the facet joints. The L4-5 facet joint on both views did not appear clear; otherwise, there was no evidence of any spondylolisthesis. There was quite a bit of angulation occurring at the L5-S1 joint, but it was measured between the two films and there was an angle change of 9 degrees between the two levels, which is not consistent with any pathologic angulation of the L5-S1 level. Dr. Pallia diagnosed Plaintiff with musculoligamentous lumbosacral strain, industrially-related; and possible L4-5 facet disease. The doctor did note of interest that Plaintiff had previously been

13

10cv2198 AJB

receiving treatment for his diabetes mellitus through County Medical Services; so it would seem reasonable that if Plaintiff had any significant ongoing discomfort in his back, which impaired him from becoming a member of the workforce, supporting himself and taking care of his children, he would have sought out care for his back through County Medical Services.

When Plaintiff returned to Dr. Pallia on November 21, 2008, the doctor reviewed the MRI scan that was recommended for Plaintiff's lumbar spine at the previous evaluation. The MRI revealed a T11 compression fracture; however, Plaintiff was not complaining of any pain up at this level in his back or on examination. While the age of the fracture was not known, because Plaintiff was asymptomatic at this level, it was obviously healed. The other finding on the MRI was facet arthrosis at the L4-5 level, where Plaintiff was having some discomfort. There was arthritic change of the facet joints, which was chronic and he may have suffered an aggravation of the facet arthrosis from his mechanism of injury, which could cause waxing and waning of pain in the lumbar spine. The issue with the facet joints was that they are really aggravated with repetitive bending and stooping activities, but not with appropriate lifting activities. Dr. Pallia opined that Plaintiff had reached permanent and stationary status. He had minimal to slight low back pain with regular activities, which can be aggravated to slight to moderate pain with bending or very heavy lifting in an bend-over position. The only work restriction recommended by Dr. Pallia was to avoid prolonged repetitive bending or stooping activities with his low back.

On December 10, 2008, Plaintiff was evaluated by Sam Maywood, M.D. During the physical examination it was noted that Plaintiff did walk with a slight limp favoring the right lower extremity; however, reciprocation of the upper extremities was normal. Lumbar spine ranges of motion revealed forward flexion to 30 degrees; extension of 10 degrees; rotation on the left and right of 25 degrees; lateral bending of 20 degrees on both the left and right; with moderate to severe pain on palpation of the lumbar spine in the midline. However, the sacroiliac joints were non-tender. The extremity evaluation was grossly normal in both the upper and lower extremities. Dr. Maywood diagnosed Plaintiff with a lumbar spine strain/sprain with T11 compression fracture; and a lumbar spine MRI evidence of facet joint arthropathy at L4-5 and L5-S1.

The ALJ also considered Plaintiff's own allegations of his symptoms and functional limitations but found those allegations as not totally credible for the following clear and convincing reasons:

First, Plaintiff's activities of daily living include: independently caring for his own personal hygiene; performing light household chores; going grocery shopping; and walking. These activities do not indicate a disabling level of impairment of Plaintiff's RFC. Second, when Plaintiff was seen in follow-up at the Sharp Rees-Stealy Medical Center on February 20, 2007 for a work status report, it was noted that he was cleared to return to modified work effective with the day of this examination. Third, when he was seen at Kaiser Permanente on March 29, 2007, the doctor instructed him to take two days off work and rest and then return to limited duty with a restriction of no heavy lifting for one month. Fourth, x-rays were taken on July 31, 2008, which showed only mild osteopenia and no other significant findings. Fifth, on multiple occasions when asked if he ever had any previous back injuries Plaintiff reported that he did not; however, medical records show that he had injured his back in 1994 for which he saw a chiropractor. This inconsistency calls the credibility of all of Plaintiff's statements into question. Sixth, lumbar spine-xrays taken on August 6, 2008 by Dr. Pallia showed that the disc spaces were well maintained; the neuroforamina appeared open on the facet joints; and no evidence of any significant arthritic changes in the facet joints. Seventh, Dr. Pallia reported that it was interesting

that Plaintiff had previously been receiving treatment for his diabetes mellitus through County Medical Services; so it would seem reasonable that if Plaintiff had any significant ongoing discomfort in his back, which impaired him from becoming a member of the workforce, supporting himself and taking care of his children, he would have sought out care for his back through County Medical Services; however, there is no evidence that this ever happened. Eighth, when discussing Plaintiff's impairments, no physician, neither any of Plaintiff's treating physicians or a State Agency physician ever opined that listing level limitations were ever met or equaled. Ninth, the objective evidence of Plaintiff's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.

(A.R. 14-18.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (A.R. 18.) The ALJ found that Plaintiff could perform sedentary work which could be impeded with additional limitations. (A.R. 19.) Having this RFC, Plaintiff was found able to perform representative occupations such as that of a lens inserter, a final assembler, or as a table worker, all of which exist in the national economy. Therefore, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act from January 25, 2007 through the date of the decision. (A.R. 19.)

## IV. APPEALS COUNCIL DECISION

The Appeals Council released its decision on August 24, 2010 and adopted the ALJ's finding and affirmed the ALJ's decision that Plaintiff was ineligible for disability benefits under sections 216(i) and 223 or Supplemental Security Income payments under sections 1602 and 1614 (a)(3)(A) of the Social Security Act. (A.R. 1-3.)

## V. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. § 423 (d)(1)(A), (2)(A) (West 2004).  An applicant must meet both requirements to be "disabled." Id.

A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1)  Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step two.  (2)  Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  (3)  Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four.  (4)  Whether the claimant is able to do any work he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled. Conversely, if the Commissioner can establish there are significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 CFR § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

B.  Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted). "A decision of the ALJ will not be

1    reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

2         Section 405(g) permits this Court to enter a judgment affirming, modifying, or

3    reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  This matter may also be remanded

4    to the Social Security Administration for further proceedings.  Id.

5    **VI. DISCUSSION**

6         A. ALJ Did Not Provide Valid Reasons for Rejecting Treating Physician's Opinion.

7         Plaintiff claims that the ALJ failed to provide specific and legitimate reasons based on

8    substantial evidence in the record for rejecting Dr. Maywood's opinion that Plaintiff would not be

9    able to maintain full-time employment on a daily basis. (Doc. 16-1, at 10, 12.) Plaintiff contends

10   that the opinion of Dr. Maywood, Plaintiff's treating physician, should have been given more

11   weight than the conflicting opinions of other physicians. (Doc. 16-1, at .)  Defendants contend that

12   the ALJ did not commit legal error because he properly evaluated Dr. Maywood's opinion. (Doc.

13   17-1, at 3.)

14        "Because treating physicians are employed to cure and thus have a greater opportunity

15   to know and observe the patient as an individual, their opinions are given greater weight than the

16   opinions of other physicians."  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  To reject a

17   treating physician's opinion which conflicts with that of an examining physician, an ALJ must

18   make "'specific, legitimate reasons for doing so that are based on substantial evidence in the

19   record.'"  Id. (quoting Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)). For example, an ALJ

20   can disregard a treating physician's diagnosis as untrustworthy when it was obtained for

21   advocative purposes, when it varies from the treating physician's previous treatment notes, or

22   when it is worded ambiguously in an apparent attempt to assist the claimant in obtaining Social

23   Security benefits.  Saelee v. Chater, 94 F3.d 520, 522 (9th Cir. 1996). The ALJ commits legal

24   error when he fails to make specific findings in rejecting the opinion of a treating physician. See,

25   e.g., Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

26        Here, the ALJ failed to dismiss the opinions of Dr. Maywood, Plaintiff's treating

27   physician, with specific and legitimate reasons for doing so based on substantial evidence in the

28   record. The ALJ's decision makes no mention of the opinions of Dr. Maywood contraindicating

     the RFC determination. (A.R. 16-17.) Dr. Maywood opined that Plaintiff would not be able to

stoop at all and that he had vision problems and had difficulty with fingering, gripping and

grasping with the right hand. (A.R. 436.) Because of his physical limitations and all the medica-

tions that Plaintiff was taking, Dr. Maywood opined that Plaintiff would not be able to perform a

full eight-hour workday as he "has difficulty with his activities of daily living that even interfere

with his ability to prepare and transport himself to and from work." (A.R. 435-36.)  This descrip-

tion contrasts with the RFC ultimately adopted by the ALJ, that Plaintiff would be able to perform

sedentary work in a full-time capacity. In his opinion, the ALJ did not mention the fact that Dr.

Maywood stated that Plaintiff would not be able to stoop at all, that he had vision problems, that

he had difficulty with fingering, gripping, and grasping with the right hand, or that the medication

Plaintiff was taking affected his ability to work. Ultimately, the ALJ failed to address Dr.

Maywood's opinion that Plaintiff would not be able to work a full eight-hour workday, which

contradicts the ALJ's RFC finding that Plaintiff could perform sedentary work on a full-time

basis.[1] As the ALJ failed to make specific findings in rejecting the contradicting opinion of Dr.

Maywood in the RFC determination, the ALJ's decision is not based on proper legal standards and

Plaintiff should be entitled to summary judgment on this issue.

   B. ALJ Erred at Step Two of the Evaluation Process.

        Plaintiff claims that the ALJ erred in not finding his difficulties with his vision and his

right hand severe at Step Two of the Sequential Evaluation Process. (Doc. 16-1, at 9.) Defendants

argue that Plaintiff failed to put forth medical evidence that Plaintiff had vision problems and a

hand impairment that could be categorized as severe under the Social Security guidelines. (Doc.

17-1, at 4.)

        At Step Two of the sequential evaluation process, the plaintiff bears the burden of

presenting medical evidence of signs, symptoms and laboratory findings that establish that a

physical impairment is severe and has lasted or can be expected to last for a continuous period of

at least twelve months. Ukolov v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005) (citing 42

---

[1]        Under SSR 96-8p, the RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.

U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)). "Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96-4P, 1996 WL 374187, at *1 (July 22, 1996). While the ALJ can expressly reject evidence regarding a plaintiff's impairments, the ALJ cannot ignore it as he must make specific and legitimate findings for rejecting an alleged impairment. See Sprague v. Bowen, 812 F.2d 1226, 1231 (9th Cir. 1987). In addition, "the ALJ must consider the combined effect of all the claimant's impairments on her ability to function, without regard to whether each one was sufficiently severe." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

Here, the ALJ committed legal error by not addressing Plaintiff's potential vision and hand impairments, two conditions that were brought up by Plaintiff's treating physician Dr. Maywood. There is conflicting evidence concerning Plaintiff's vision and hand impairments which should have been addressed by the ALJ even if the ALJ were to ultimately reject the evidence. The ALJ should have also considered the combined effects, if any, of Plaintiff's alleged vision and hand impairments to Plaintiff's overall ability to function.  Thus, the ALJ's decision at Step Two is not based on proper legal standards and Plaintiff should be entitled to summary judgment on this issue.

C. The ALJ Did Not Err at Step Three of the Sequential Evaluation Process.

Plaintiff argues that the ALJ failed to find his T-11 fracture and facet joint arthrosis with accompanying pain, motor loss, and reflex loss met or equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Doc. 16-1, at 13-14.) Defendants argue that Plaintiff has not met his burden in proving that he has an impairment that meets or equals the criteria of a listed impairment in Appendix 1 of the Commissioner's regulations and that the ALJ's finding that he did not have any impairments that either met or equaled a listing is supported by substantial evidence. (Doc. 17-1, at 5-6.)

At Step Three, the claimant bears the burden of proving that his impairment meets or equals one of the listed impairments described in the Social Security regulations. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). To meet a listing, the claimant's medical findings have to

match all of those described in that listing. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). "The mere diagnosis of an impairment listed in Appendix 1 is not sufficient to sustain a finding of disability." <u>Key v. Heckler</u>, 754 F.2d 1545, 1549-50 (9th Cir. 1985). "It must also have the findings shown in the Listing of that impairment." <u>Id.</u> at 1545-50. Similarly, determinations of equivalence must be based on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques. <u>See</u> 20 CFR §§ 404.1526(b), 404.1529(d)(3). If substantial evidence supports the ALJ's finding that the claimant did not have an impairment that met or medically equaled one of the listed impairments in the Social Security regulations, then the ALJ's finding at Step Three should stand. <u>Lewis v. Apfel</u>, 236 F.3d 503, 512-15 (9th Cir. 2001).

Here, Listing 1.04A requires all of the following: the presence of a spinal disorder (e.g., facet arthritis or vertebral fracture), resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). <u>See</u> 20 CFR § 404, subpt. P, App. 1, § 1.04A. Substantial evidence supports the ALJ's Step Three finding that Plaintiff did not have an impairment that met or medically equaled this listed impairment. The ALJ noted, and the Plaintiff admitted, that no physician has opined that his condition meets or equals any listing. (A.R. 14; doc. 16-1, at 14.)  Moreover, the state agency program physicians specifically opined that Plaintiff's condition does not meet a listed impairment. (A.R. 14.) Plaintiff argues that Dr. Maywood's supplemental report dated January 11, 2010 showed x-rays that clearly reveal a T-11 vertebral fracture and the MRI revealed multiple levels of facet joint arthrosis. (Doc. 16-1, at 14.) However, this report is devoid of several of listing 1.04A's required clinical findings, including descriptions of neuro-anatomic distribution of pain and results from a positive straight-leg raising test. Thus, the ALJ's finding at Step Three is supported by substantial evidence, and Plaintiff's motion for summary judgment on this issue should be denied.

D. ALJ Should Reevaluate Plaintiff's Credibility in Light of Physician's Testimony.

Plaintiff argues that the ALJ erred in finding Plaintiff's claims about his diminished RFC as not totally credible. (Doc. 16-1, at12.) Specifically, Plaintiff argues that the ALJ did not properly look at the entire case record when evaluating Plaintiff's credibility, including not giving the proper weight to testimony from his treating physician, Dr. Maywood, who stated that he believe Plaintiff was disabled. (Doc. 16-1, at 17-18.) Instead, Plaintiff argues that the ALJ erroneously discounted his credibility and improperly gave too much weight to his ability to perform light household chores in his daily living in making his erroneous RFC finding. (Id.) Defendants argue that the ALJ properly discounted Plaintiff's credibility with clear and convincing reasons for doing so. (Doc. 17-1, at 7-11.)

If a claimant has met his burden of producing objective medical evidence, an ALJ can reject the claimant's subjective complaints by expressing clear and convincing reasons for doing so. Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The ALJ may consider the following factors in evaluating a Plaintiff's credibility: 1) his reputation for being honest; 2) inconsistencies in Plaintiff's testimony; 3) inconsistencies in the Plaintiff's conduct; 3) daily living activities; 4) his work record; and 5) physician's testimony concerning the symptoms alleged. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). In rejecting Plaintiff's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." Thomas, 278 F.3d at 959.

Here, the ALJ discounted Plaintiff's credibility by considering Plaintiff's daily living activities, inconsistencies in Plaintiff's conduct and his testimony, and his work record. The ALJ also evaluated some of the testimonies of Plaintiff's treating and evaluating physicians in his credibility findings. (A.R. 7-8.)  Importantly, however, the ALJ failed to fully consider the opinions of Plaintiff's treating physician Dr. Maywood, who thought Plaintiff could not perform a regular eight-hour workday because of his disabilities. (A.R. 435-36.) Thus, as Plaintiff's ultimate credibility is dependent upon findings relating to Plaintiff's impairments as reflected in his treating physician's opinions, the ALJ should reevaluate Plaintiff's credibility on remand. Plaintiff's

1   motion for summary judgment on this issue should be granted.

2   ///

3   **VII. CONCLUSION**

4

5       Remand for further proceedings is appropriate where additional proceedings could

6   remedy defects in the Commissioner's decision. Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir.

7   1984). That is the case here. For the reasons set forth above, the Court recommends granting in

8   part Plaintiff's Motion for Summary Judgment and denying in part Defendant's Motion for

9   Summary Judgment.   The Court recommends that the case be remanded to the Social Security

10  Administration for further factual development and legal analysis of Plaintiff's impairments, his

11  residual functional capacity, and his ability to do past or other work.

12      This report and recommendation is submitted to the Honorable Battaglia, the United

13  States District Judge assigned to the case, pursuant to 28 U.S.C. §636(b)(1).  Any party may file

14  written objections with the Court and serve a copy on all parties on or before **March 9, 2012**.  The

15  document should be captioned "Objections to Report and Recommendation."  Any reply to the

16  objections shall be served and filed on or before **March 19, 2012**.  The parties are advised that

17  failure to file objections within the specific time may waive the right to appeal the district court's

18  order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19      IT IS SO ORDERED.

20  DATED: February 28, 2012

21  _____

22  Peter C. Lewis

23  U.S. Magistrate Judge
    United States District Court

24

25

26  cc:  All Parties and Counsel of Record

27

28